**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X
:
**ERICK J. FEITSHANS and STEVE**               :
**HODGES,**                                    :
:
Plaintiffs,                      :
:
- against -                     :
:
**MICHAEL KAHN, LAURA KAHN,**                 :
**MICHAEL ASHKIN, WINTER FILMS, LLC,**  :
**IKAHN PRODUCTIONS, INC. and**               :
**DOES 1-10,**                                :
:
Defendants.                     :
:
-------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8/24/07
```

**OPINION AND ORDER**

**06 Civ. 2125 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.        INTRODUCTION

Plaintiffs bring this action against the alleged alter egos of their former employers, now defunct corporations, in order to collect judgments awarded in arbitration for breach of their employment contracts. In opposition, defendants argue that piercing of the corporate veil is inappropriate where the corporations in question may be closely-held, but are distinct entities. Following discovery, all parties moved for summary judgment. For the reasons set forth below, each motion is denied in its entirety.

1

## II.    BACKGROUND

### A.    Facts[1]

Erick J. Feitshans and Steve Hodges bring this suit to recover damages for the alleged breach of their employment contracts[2] with two companies formerly in the film industry, Ikahn Productions, Inc. ("Ikahn") and Winter Films, LLC ("Winter Films") (collectively, the "Entity Defendants").[3]  On December 31, 1999, Ikahn ceased its operations and Winter Films, a limited liability company formed only days before on December 27, assumed its rights and obligations.[4]  Among those obligations was the employment contract between Feitshans and Ikahn, which Winter Films continued to honor[5] until June 28, 2002, at which time its counsel informed both Feitshans and Hodges that it no longer

---

[1]    The facts summarized in this section are undisputed.

[2]    Feitshans' contract with Ikahn was signed on November 4, 1999, and Hodges' contract with Winter Films was signed on March 1, 2000.  *See* Defendants' Amended Rule 56.1 Statement ("Def. 56.1") ¶¶ 1-2.

[3]    *See* Def. 56.1 ¶ 3; Plaintiffs' Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Pl. 56.1") ¶¶ 9, 48.

[4]    *See* Pl. 56.1 ¶¶ 10-11; Def. 56.1 ¶¶ 10, 27.

[5]    *See* Pl. 56.1 ¶ 10; Def. 56.1 ¶ 10.

2

had funds to operate its business or pay their salaries.[6]

Plaintiffs demanded arbitration pursuant to an identical provision in each of their employment contracts which states that "[a]ny claim or controversy" arising out of the contract shall be arbitrated in New York.[7]  On or about December 4, 2003, Feitshans was awarded $172,938 in salary plus interest at six percent from July 12, 2002 until paid, and Hodges was awarded $85,769.49 plus interest at six percent from July 28, 2002 until paid.[8]  The Supreme Court, New York County, confirmed both awards into judgments on or about July 12, 2004.[9]

---

[6]     See Pl. 56.1 ¶ 82. Note that although this paragraph lists "July 2002" as the date of plaintiffs' termination notice, the actual notice is dated June 28, 2002. See 6/28/02 Letter from Joel Salon to Erick Feitshans, Ex. 14 to 7/6/07 Evidence Supporting Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Summary Judgment; or in the Alternative, Partial Summary Judgment.

[7]     Both employment contracts also designated New York as the governing law and forum for any suit arising out of the contracts. See 11/4/99 Employment Agreement between Ikahn and Feitshans and 3/1/00 Employment Agreement between Winter Films and Hodges at ¶ 12.9, Exs. 1 and 2 to Second Amended Complaint ("Compl.").

[8]     See Pl. 56.1 ¶¶ 47, 49; Def. 56.1 ¶ 17. Note that although Pl. 56.1 ¶ 49 states that Hodges is entitled to his award plus six percent interest from July 12, 2002 until paid, the arbitration award specifies that interest runs from July 28, 2002. See 12/4/03 American Arbitration Association award in the Matter of the Arbitration between Stephen Hodges/Erick Feitshans and Winter Films, LLC/ Ikahn Productions, Inc., Ex. H to 5/30/06 Affidavit of Richard P. Romeo in Support of Defendants' Motion to Dismiss the Complaint.

[9]     See Pl. 56.1 ¶¶ 47, 50; Def. 56.1 ¶ 18.

3

The Entity Defendants were both legally dissolved shortly thereafter: Ikahn was dissolved on August 16, 2004 and Winter Films was dissolved on December 21, 2004.[10]

### 1.    Ikahn

Ikahn was a New York corporation in the business of developing and producing movies.[11]  The first meeting of its incorporators, the election of its officers and directors, and the adoption of by-laws occurred on June 5, 1998.[12] Defendants Michael Kahn and Laura Kahn served as Ikahn's elected officers (Chairman/President and Secretary/Treasurer, respectively), directors and sole shareholders.[13]  Michael Kahn directed Ikahn's day-to-day operations, made all business decisions, and did not report to anyone at the company.[14]

Following its initial meeting in June 1998,[15] Ikahn filed documentation with both the New York and California Departments of State to

---

[10]     *See* Pl. 56.1 ¶¶ 8, 90.

[11]     *See* Def. 56.1 ¶¶ 19, 3.

[12]     *See id.* ¶¶ 20-21.

[13]     *See id.* ¶¶ 4-6.

[14]     *See* Pl. 56.1 ¶ 6; Def. 56.1 ¶ 66.

[15]     Whether Ikahn held any other corporate meetings is in dispute.

4

certify certain corporate actions including a name change, registration to qualify

for transaction of business in California, and finally, dissolution in August 2004.[16]

Through operation of its business, Ikahn incurred expenses including

salary/wage payments, rent, tax and license fees, and other miscellaneous costs.[17]

Ikahn also filed state (New York and California) and federal tax returns for the

years 1999-2003.  For at least one of those tax filings, Ikahn used the address of

Defendant Darby Group Companies ("Darby"),[18] a New York corporation that

distributes supplies to veterinarians, doctors, dentists and other health care

practitioners,[19] and is owned and controlled, either directly or via trusts, by

Defendant Michael Ashkin's family.[20]  According to its 1999 tax return, Ikahn

had losses in the amount of $319,752, loans from shareholders in the amount of

$701,272, and no funds in capital stock.[21]  Ikahn's 2000 tax return reflects that

---

[16]     *See* Def. 56.1 ¶¶ 24-26.

[17]     *See id*. ¶¶ 38-41.

[18]     *See* Def. 56.1 ¶ 35; Defendants' Amended Rule 56.1 Counter-Statement of Undisputed Facts ("Def. Counter. 56.1") ¶ 2.

[19]     *See* Def. 56.1 ¶¶ 11-12.

[20]     *See* Pl. 56.1 ¶ 19.

[21]     *See id*. ¶¶ 57-58; Def. 56.1 ¶¶ 57-58; 1999 U.S. Income Tax Return for an S Corporation Form 1120S for Ikahn ("1999 Ikahn Tax Return"), Ex. B to 7/5/07 Amended Affirmation of Richard P. Romeo in Opposition to Plaintiffs'

there were two loan repayments in equal amounts of $127,817 made to Michael and Laura Kahn with the balance entered as additional paid-in capital, resulting in no loan indebtedness at year-end.[22]

Ikahn conducted its business out of office space on Park Avenue in New York, which it began leasing in June 1998.[23]  When Ikahn ceased operations in 2000, Winter Films assumed the Park Avenue lease until July 2001, at which time it terminated the lease and vacated the premises.[24]

## 2.    Winter Films

Winter Films was a New York limited liability company in the business of developing and producing movies.[25]  The company was formed on December 27, 1999 pursuant to its Articles of Organization, which it filed with the New York Department of State on the following day.[26]  Michael and Laura Kahn each owned a five percent share of the company, with the balance owned by

---

Motion for Summary Judgment ("Romeo S.J. Aff."), at 1.

[22]     *See* Pl. 56.1 ¶ 59; 2000 U.S. Income Tax Return for an S Corporation Form 1120 S for Ikahn, Ex. B to Romeo S.J. Aff., at 2.

[23]     *See* Pl. 56.1 ¶ 16; Def. 56.1 ¶ 2.

[24]     *See* Def. 56.1 ¶ 62.

[25]     *See id.* ¶¶ 3, 27.

[26]     *See id.* ¶ 27.

M&S Investment Partnership ("M&S IP"), a non-party partnership in which Ashkin holds a ninety-nine percent interest.[27]  The Kahns also served as Winter Films' managers, and Michael Kahn handled the company's day-to-day operations.[28]  Following its formation in late 1999, Winter Films filed documentation with both the New York and California Departments of State to certify certain corporate actions including a notice of operation under an assumed name, registration to qualify for transaction of business in California, change in the designation of registered agent, and finally, dissolution in December 2004.[29]

Similar to Ikahn, Winter Films also used Darby's address for certain corporate purposes, including its tax filings.[30]  Additionally, throughout the period from November 1999 through July 2002, Darby personnel processed Winter Films' employment applications and other employment-related forms including healthcare enrollment forms, and performed accounting and

---

[27]     *See* Pl. 56.1 ¶¶ 12-14.

[28]     *See* Def. 56.1 ¶ 69; Def. Counter. 56.1 ¶ 83.

[29]     *See* Def. 56.1 ¶¶ 30-32, 34.

[30]     *See* Pl. 56.1 ¶ 17; 2001-2002 U.S. Return of Partnership Income Form 1065 for Winter Films ("2001-2002 Winter Films Tax Returns"), Ex. B to Romeo S.J. Aff., at 5, 14.

bookkeeping services related to payment of bills on behalf of Winter Films.[31]

Through operation of its business, Winter Films incurred expenses including salary/wage payments, rent, tax and license fees, and other miscellaneous costs.[32] The company employed individuals who worked from California (in its leased office space, personally guaranteed by Michael Kahn)[33] and New York.[34] Winter Films also filed state (New York and California) and federal tax returns for the years 2000-2002, which reflected that the company made no revenue, profit or income.[35] During that same period, and throughout the course of each year, Winter Films received funding in the total amount of $4,069,659 from Michael and Laura Kahn, and M&S IP.[36] As of the end of 2002, Winter Films' capital account contained assets in the amount of $366,955.[37]

---

[31]    *See* Def. 56.1 ¶ 76; Def. Counter. 56.1 ¶¶ 55-56.

[32]    *See* Def. 56.1 ¶¶ 42-53.

[33]    *See* Pl. 56.1 ¶¶ 23-24.

[34]    *See* Def. 56.1 ¶¶ 81-93.

[35]    *See id.* ¶ 35.

[36]    *See id.* ¶ 37.

[37]    *See* Pl. 56.1 ¶ 64.

8

**B.      Procedural History**

Plaintiffs commenced this action by filing a complaint in the United States District Court for the Central District of California on July 27, 2005, seeking, inter alia, to pierce the corporate veil and hold the Individual Defendants liable for payment of the arbitration awards rendered against the Entity Defendants for breach of contract.  By Order dated March 7, 2006, that court granted defendants' motion to transfer the case to this district.  On May 9, 2006, plaintiffs filed an amended complaint in this Court against the Entity Defendants, as well as the Kahns, Ashkin and Darby (collectively, the "Individual Defendants").[38]  Defendants moved to dismiss the amended complaint in its entirety, and this Court granted that motion in part by Opinion and Order dated September 21, 2006.[39]

Defendants then moved for reconsideration of the portion of the Court's Order that declined to dismiss plaintiffs' claim for attorneys' fees should they prevail on their alter ego claim.  By Opinion and Order dated October 31,

---

[38]      *See* Compl. ¶ 3.

[39]      *See Feitshans v. Kahn*, No. 06 Civ. 2125, 2006 WL 2714706 (S.D.N.Y. Sept. 21, 2006) (dismissing plaintiffs' first two causes of action based on res judicata).

2006, the Court denied defendants' motion.[40]  Plaintiffs now move for summary

judgment or in the alternative, partial summary judgment on the issue of liability.

Defendants have filed a cross motion for summary judgment on the grounds that

there is no legal basis to pierce the corporate veil.

## III.   APPLICABLE LAW

### A.   Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the

moving party is entitled to judgment as a matter of law."[41]  An issue of fact is

genuine "'if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party.'"[42]  A fact is material when it "'might affect the outcome of

the suit under the governing law.'"[43]  "It is the movant's burden to show that no

---

[40]    *See Feitshans v. Kahn*, No. 06 Civ. 2125, 2006 WL 3096028
(S.D.N.Y. Nov. 1, 2006).

[41]    Fed. R. Civ. P. 56(c).

[42]    *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir.
2006) (quoting *Stuart v. American Cyanamid Co.*, 158 F.3d 622, 626 (2d Cir.
1998)).

[43]    *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir.
2007) (citing *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005)).

genuine factual dispute exists."[44]

In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. To do so, it must do more than show that there is "'some metaphysical doubt as to the material facts,'"[45] and it "'may not rely on conclusory allegations or unsubstantiated speculation.'"[46] However, "'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"[47]

In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor.[48] However, "[i]t is a

---

[44]     *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

[45]     *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[46]     *Jeffreys*, 426 F.3d at 554 (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2002)).

[47]     *McClellan*, 439 F.3d at 144 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)).

[48]     *See Allstate Ins. Co. v. Hamilton Beach/Proctor Silex, Inc.*, 473 F.3d 450, 456 (2d Cir. 2007) (citing *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 312 (2d Cir. 1997)).

settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'"[49]  Summary judgment is therefore inappropriate "if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party."[50]

## B.    Piercing the Corporate Veil

It is well-accepted that incorporation is a legitimate means to avoid personal liability, and this presumption of legitimacy is "particularly strong in contract cases" where the parties choose to deal with each other and can negotiate guarantees or security arrangements.[51]  In light of such presumption, the Second Circuit has stated that "under New York law, courts must be extremely reluctant to pierce the corporate veil"[52] and should disregard the corporate form only where

---

[49]     *McClellan*, 439 F.3d at 144 (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)).  *Accord Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986).

[50]     *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citing *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000)).

[51]     *Carte Blanche (Singapore) PTE., LTD v. Diners Club Int'l*, 758 F. Supp. 908, 913 (S.D.N.Y. 1991).

[52]     *United States v. Funds Held ex rel. Wetterer*, 210 F.3d 96, 106 (2d Cir. 2000) (stating that courts should disregard corporate form "only when the corporation *primarily* transacts the business of the dominating interest rather than its own") (citing *William Wrigley Jr. Co. v. Waters*, 890 F.2d 594, 600 (2d Cir. 1989)).

plaintiffs satisfy a "heavy burden"[53] in showing that the corporation is being

"used by an individual to accomplish his own and not the corporation's

business."[54] Indeed, courts will pierce the corporate veil to prevent fraud or

achieve equity and impose a corporation's obligations on its owners only where it

is shown that the corporation no longer exists independent of that ownership.[55]

ᠻ           While the determination of whether to pierce the corporate veil

"necessarily turns on the attendant facts and equities at issue,"[56] it is required that

plaintiffs show:  (1) that the owners exercised complete domination of the

corporation with respect to the transaction at issue; and (2) that such domination

was used to commit a fraud or wrong which caused the plaintiff's injury.[57]  Where

such a showing is made, courts will pierce the veil rather than allow dominating

---

[53]     *TNS Holdings, Inc. v. MKI Sec. Corp.*, 92 N.Y.2d 335, 339 (1998).

[54]     *William Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*,
933 F.2d 131, 138 (2d Cir. 1991) (citing *Walkovszky v. Carlton*, 18 N.Y.2d 414,
417 (1966)).

[55]     *See Morris v. New York State Dep't of Taxation & Fin.*, 82 N.Y.2d
135, 141-42 (1993) (noting that veil-piercing does not constitute an independent
cause of action but rather "an assertion of facts and circumstances which will
persuade the court to impose the corporate obligation on its owners").

[56]     *Id.* at 141.

[57]     *See American Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134
(2d Cir. 1997) (citing *Morris*, 82 N.Y.2d at 141).

individuals or entities to wield the corporate form as a shield to protect against personal liability.

### 1.    Domination or Control

The domination inquiry is aimed at determining whether the defendant owners have used the corporation to exercise their own will and further their interests to such an extent that the corporation has been reduced to an alter ego.[58] The Second Circuit has enunciated a number of factors that are relevant to determining whether a defendant corporation is dominated by its owners. These factors include:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.*, issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, (10) whether the corporation in question had property that

---

[58]      *See Network Enters., Inc. v. APBA Offshore Prods., Inc.,* No. 01 Civ. 11765, 2004 WL 1837349, at *5 (S.D.N.Y. Aug. 16, 2004) (citing *Wetterer,* 210 F.3d at 106).

was used by other of the corporations as if it were its own.[59]

Because "no one factor is decisive,"[60] courts are tasked with

conducting a broad-based inquiry into the "'totality of the facts'"[61] to

determine whether the domination prong has been satisfied.

### 2.   Fraud or Wrong Causing a Plaintiff's Injury

Courts may not pierce the corporate veil of a corporation solely

based on a finding of domination.  Indeed, the Second Circuit has reversed

courts in this district precisely for their failure to make findings as to the

second prong.[62]  The Second Circuit has made clear that although domination

is the "key" to veil-piercing, it, "standing alone, is not enough."[63]  Rather, a

---

[59]     *Passalacqua*, 933 F.2d at 139.

[60]     *Freeman v. Complex Computing Co., Inc.*, 119 F.3d 1044, 1053 (2d Cir. 1997).

[61]     *Wetterer*, 210 F.3d at 106 (quoting *United States v. Jon-T Chemicals, Inc.*, 768 F.2d 686, 692 (5th Cir. 1985)).

[62]     *See MAG Portfolio Consult, GMBH v. Merlin Biomed Group, LLC*, 268 F.3d 58, 64 (2d Cir. 2001) (finding district court's inquiry into second prong to be "even more cursory" than that of first prong and remanding for evidentiary hearing); *Thrift Drug, Inc. v. Universal Prescription Adm'rs*, 131 F.3d 95, 98 (2d Cir. 1997) (remanding to district court the question of whether defendant's domination of the corporation was used to commit a fraud or wrong on plaintiff, causing him injury).

[63]     *Freeman*, 119 F.3d at 1053 (citing *Morris*, 82 N.Y.2d at 142).

plaintiff must also satisfy the second prong of the veil-piercing inquiry by

showing that the defendant, "through his domination, misused his personal

ends so as to commit a wrong or injustice" resulting in harm to the plaintiff.[64]

"Without a finding that the domination occurred for the purpose of

committing a wrong," and that the wrong caused harm to the plaintiff, the

court cannot pierce the corporate veil regardless of the level of domination.[65]

      "Proof of a stripping of the assets" of a subsidiary by the parent,

or of an entity by its shareholders, which is "motivated by a desire to render

the subsidiary [or entity] judgment proof," constitutes a fraud or wrong in

satisfaction of the second prong.[66]  For example, courts have found that the

diversion of a dominated entity's funds into the dominating party's personal

---

[64]    *Morris*, 82 N.Y.2d at 143. *Accord Freeman*, 119 F.3d at 1053
(reversing and remanding on grounds that district court pierced the corporate veil
without determining whether defendant used his control over the corporation to
commit a fraud or other wrong resulting in unjust loss or injury to plaintiff).

[65]    *MAG Portfolio*, 268 F.3d at 64.

[66]    *Carte Blanche*, 758 F. Supp. at 917. *Accord Born Oil Trading Ltd. v.
Interpetrol Bermuda Ltd.*, 774 F. Supp. 840, 847 (S.D.N.Y. 1991) (noting that
proof of asset-stripping supports an action for veil-piercing and does not state a
separate cause of action); *Godwin Realty Assocs. v. CATV Enters., Inc.*, 712
N.Y.S.2d 39, 41 (1st Dep't 2000) (finding second prong satisfied where evidence
demonstrated that shareholders were on notice of claims asserted by plaintiffs and
stripped corporation, leaving insufficient assets to cover claimed damages).

bank accounts, while on notice of a potential judgment against the entity,

constitutes dissipation of assets that could

otherwise have been used towards satisfying plaintiff's judgment.[67]

## IV.    DISCUSSION

### A.    Domination or Control

Feitshans and Hodges contend that the Individual Defendants so

dominated the Entity Defendants that they may be considered their alter

egos.  Plaintiffs point to a number of undisputed facts regarding the

relationship between the Individual and Entity Defendants, and argue that a

finding of domination is mandated, as a matter of law.  Individual

Defendants, in turn, move for summary judgment on the grounds that

domination cannot be found, as a matter of law, where the Entity Defendants

were closely-held corporations undisputedly engaged in a legitimate business

purpose, with salaried employees and with business expenses incurred and

paid pursuant to that purpose, among other factors.  Plaintiffs and Individual

Defendants agree that *William Passalacqua Builders, Inc. v. Resnick*

*Developers South, Inc.* ("*Passalacqua*") sets forth the relevant framework to

---

[67]    *See JSC Foreign Economic Ass'n Technostroyexport v. International Dev. & Trade Servs., Inc.*, 306 F. Supp. 2d 482, 486 (S.D.N.Y. 2004).

be used by this Court in evaluating whether the Entity Defendants are dominated corporations.[68]  Although the parties are "not required to show that all ten of the *Passalacqua* factors weigh in favor"[69] of their claim, an examination of the record indicates that genuine issues of material fact persist as to a number of those factors.  Therefore, a jury must determine whether the Entity Defendants were dominated by the Individual Defendants to such an extent that they lacked distinct corporate identities.

As an initial matter, it is undisputed that Ikahn was owned, managed, directed and run by Michael and Laura Kahn.[70]  Winter Films was also managed by Michael and Laura Kahn, and owned by the Kahns and M&S IP, which is virtually wholly owned by Michael Ashkin.  Both companies submitted corporate filings with the New York Department of State (and the California Secretary of State) in tandem with certain actions

---

[68]     In fact, Plaintiffs' Memorandum of Points and Authorities in Support of Motion for Summary Judgment; or in the Alternative, Partial Summary Judgment ("Pl. Mem.") cites just two cases, one of which is *Passalacqua*.

[69]     *Powers v. Fox Television Stations, Inc.*, 907 F. Supp. 719, 724 (S.D.N.Y. 1995).

[70]     While the Individual Defendants contend, and plaintiffs do not dispute, that Michael Kahn had ultimate management authority with respect to the Entity Defendants, Laura Kahn is Ikahn's Vice President/Secretary/Treasurer, elected director and fifty percent shareholder.  *See* Def. 56.1 ¶¶ 5-7.

18

such as name change, registration to become qualified for transaction of

business within the state, and eventual dissolution. Further, each Entity

Defendant maintained separate books and records, and bank accounts,[71] paid

regular salaries and wages to its employees, filed separate tax returns, and

paid out other operational expenses associated with their businesses.[72]

.

Based on the absence of recorded minutes, there remains a

genuine dispute as to whether the Entity Defendants ever held any corporate

meetings. New York's Business Corporation Law mandates that

corporations maintain minutes of shareholder, director and/or executive

proceedings.[73] Nevertheless, courts in this district are "especially hesitant to

find a disregard of the corporate form when closely-held corporations are

involved."[74] Plaintiffs contend that the Entity Defendants were too closely

---

[71]    *See* Pl. Mem. at 14.

[72]    *See* Def. 56.1 ¶¶ 35, 38-53.

[73]    *See* N.Y. Bus. Corp. Law § 624(a) (2003) ("Each corporation shall
keep correct and complete books and records of account and shall keep minutes of
the proceedings of its shareholders, board and executive committee, if any. . .").

[74]    *Columbia Pictures Indus. v. Screen Gems Film Co.,* No. 99 Civ.
4407, 2001 WL 1254838, at *10 (S.D.N.Y. Oct. 18, 2001) (citing
*Bridgestone/Firestone, Inc. v. Recovery Credit-Servs., Inc.,* 98 F.3d 13, 17 (2d Cir.
1996) ("[C]ourts recognize that with respect to small, privately-held corporations,
the trappings of sophisticated corporate life are rarely present and we must avoid
an over-rigid preoccupation with questions of structure, financial and accounting

held, such that they crossed the line from being closely held by the

Individual Defendants to becoming their mere alter egos. Indeed, plaintiffs

point to the significant, and nearly complete, overlap between the Individual

Defendants and the owners, officers and directors of the Entity Defendants.

Plaintiffs also raise the fact that while the Entity Defendants leased space in

New York City from 1998 through 2001, both continued to use Darby's

Westbury, New York address as their corporate mailing address, which is

evident from their tax filings.[75] Additionally, plaintiffs note, and defendants

do not dispute, that Michael Kahn personally guaranteed Winter Films' lease

of California office space; moreover, a number of rental bills for that space

was sent to the attention of a Darby employee at Darby's address.[76]

Plaintiffs further contend that the Individual Defendants kept

---

sophistication or dividend policy or history.") (quotation omitted).

[75]    *See, e.g.*, 1999 Ikahn Tax Return, Ex. D to 6/15/07 Affirmation of
Richard P. Romeo in Opposition to Plaintiffs' Motion for Summary Judgment, at
1. The Court notes that defendants' amended affirmation and materials (submitted
in opposition to summary judgment) omitted the first few pages of Ikahn's 1999
Form 1120S tax filing. Specifically, the cover page bearing Ikahn's address was
omitted. I am therefore citing to defendants' original affirmation (which included
the missing pages), dated June 15, 2007, that had been rejected for noncompliance
with the Court's individual rules.

[76]    *See* Pl. 56.1 ¶¶ 26-28.

20

the Entity Defendants in a perpetually undercapitalized state, and loaned

money only on an as-needed basis rather than pursuant to any business plan

or purpose. While Winter Films' deposit detail and Darby's Balance Sheet

analyses reflect transfers of funds from the Kahns and M&S IP to Winter

Films,[77] the Individual Defendants assert that these funds were actual

contributions rather than loans. Moreover, they argue that the Entity

Defendants' ability to meet their day-to-day expenses, including payment of

Feitshans' salary from 1999 through 2002 and Hodges' salary from 2000

through 2002, militates against a finding of undercapitalization.[78] Though

the exact nature of these funds – and whether they can be properly

characterized as contributions or loans – remains disputed, Individual

Defendants concede that the Entity Defendants, specifically Winter Films,

lacked operating funds at the start of 2000, reported annual losses from 2000

through 2002, and essentially were "wholly reliant on [Individual

Defendants] for the operating funds necessary for [their] continuing

---

[77]    *See* 1/10/00-11/19/03 Winter Films, LLC Deposit Detail, Ex. M to
Romeo S.J. Aff.

[78]    *See* Def. 56.1 ¶¶ 54-55. *See also Oriental Commercial & Shipping
Co. v. Rossel, N.V.*, 702 F. Supp. 1005, 1021 (S.D.N.Y. 1991) (finding
undercapitalization of entity where, among other issues, alleged alter ego "paid no
rent, no insurance, no subscriptions, nor any 'rates' or 'service charges'").

existence."[79]

Turning to the issue of whether the Individual Defendants

deposited, withdrew, or otherwise used funds from the Entity Defendants for

personal rather than corporate purposes, plaintiffs present evidence of Fed-

Ex shipments billed to the corporate account of Winter Films, but used to

transmit packages for seemingly non-corporate, personal purposes.[80]  The

airbills, small in number, include those addressed from Michael Kahn to

various entities such as the "Miami Shores Golf & Country Club" and the

---

[79]    *Oriental*, 702 F. Supp. at 1021 (finding undercapitalization of entity where, among other issues, alleged alter egos relied upon dominating entity for operating funds needed to exist).  *See, e.g.*, 11/13/06 Deposition of Michael Kahn at 37-38, Ex. _ to 5/25/07 Affirmation of Richard P. Romeo in Support of Defendants' Motion for Summary Judgment ("If Ikahn incurred any expenses, myself or any of the other shareholders or investors contributed capital in order to pay the bills.").  Because defendants' amended affirmation and materials omitted the pages of Michael Kahn's deposition cited above, I am compelled to cite to an earlier version of Romeo's moving affirmation.

[80]    *See* Federal Express USA Airbills from Winter Films Company Account ("Fed-Ex Airbills"), Ex. G to Romeo S.J. Aff.; Pl. 56.1 ¶¶ 32-38.  The Court notes that while plaintiffs have made it a point to emphasize the existence of Fed-Ex Airbills both addressed to and from a mysterious "DKNY" party – the identity of which the parties dispute – plaintiff Feitshans himself received at least two packages from "DKNY" on September 14 and December 14, 2001, and therefore should have knowledge as to its true identity.  *See* Fed-Ex Airbills at 2, 8.

22

"American Junior Golf Association."[81]  Plaintiffs also point to Michael

Kahn's use of legal services provided by Winter Films' attorney, Mark E.

Mahler, for assistance with his application to reinstate his California driver's

license, though it is disputed whether Winter Films was actually billed for

this service.[82]  It is further disputed whether Michael Kahn's rental of a car

while in California, and Winter Films' subsequent payment of a release to

the rental agency, Budget, for damage to the car, was inappropriately billed

to Winter Films.  Specifically, the disputed question is whether Kahn

traveled to California on behalf of Winter Films and could therefore bill the

company for costs incurred, or whether Winter Films' corporate account was

simply absorbing his personal and unrelated expenses.

Although the evidence suggests a possible misuse of corporate

funds, it fails to unequivocally support a finding that the assets of the Entity

Defendants and Individual Defendants were intermingled, or that the

Individual Defendants, particularly Michael Kahn, siphoned or shifted funds

to personal accounts for their own use.  The Fed-Ex shipments, standing

alone, are so de minimis in nature that they "hardly amount[] to a shuttling of

---

[81]     See, e.g., Fed-Ex Airbills at 1, 8.

[82]     See Pl. 56.1 ¶¶ 41, 43-45.

personal funds in and out of corporate accounts."[83]  Further, although the

Court must look to the totality of the evidence to determine whether this

particular *Passalacqua* factor exists, it is clear that the additional evidence

regarding Michael Kahn's use of Winter Films' resources for reinstatement

of his driver's license and payment of a release from a rental agency remains

in dispute.

"Even if one or more of these questioned transactions were

'purely personal' in character, they still would not suffice to establish that

[Entity Defendants] exist[] *primarily* to advance [Individual Defendants']

business" rather than their own.[84]  The Second Circuit has stated that such

limited transactions "(at worst). . . represent a misappropriation" of the

[dominated entities'] funds rather than an identity between its director and

the corporation."[85]

As discussed above, the record with respect to certain

---

[83]     *Wetterer*, 210 F.3d at 107 (quotation omitted).

[84]     *Id.* at 108.

[85]     *Id. Cf. JSC Foreign*, 386 F. Supp. at 474 (finding intermingling of
funds where defendants directly wired corporation's proceeds into their personal
accounts, paid themselves and family members large "consulting fees," and
"loaned" themselves funds for the purchase and renovation of real estate for
personal use).

*Passalacqua* factors strongly suggests domination or control of the Entity

Defendants. These factors include the overlap in ownership between the

Entity and Individual Defendants, the Entity Defendants' dependence on the

Individual Defendants for operating funds, the bare adherence to corporate

formalities, and the personal guarantee of Winter Films' business lease by

one of the Individual Defendants.

However, genuine issues of material fact persist and must be

submitted to the trier of fact for resolution. Indeed, there are a number of

factors that weigh against a finding of domination. *First*, the Entity

Defendants were legally-formed entities with numerous salaried employees,

including both plaintiffs and several others;[86] they kept separate bank

accounts, maintained separate books and records, made separate tax filings,

and paid expenses incurred during the operation of their businesses. *Second*,

the Entity Defendants were operated pursuant to a business plan aimed at

developing and producing films and "pursu[ed] [their] separate corporate

business."[87] *Third*, although Darby employees "process[ed] paperwork for

---

[86]      *See* Def. 56.1 ¶¶ 81-93.

[87]      *Primex Plastics Corp. v. Lawrence Prods., Inc.*, No. 89 Civ. 2944,
1991 WL 183367, at *6 (S.D.N.Y. Sept. 12, 1991) ("Where the individual
carefully respects the separate identity of the corporation and the corporation is

new hires, inputt[ed] hours onto Winter Films ADP payroll system and

perform[ed] accounting and bookkeeping services related to the payment of

Winter Films' bills,"[88] courts in this district have found that even where

companies "share office space and administrative costs and functions

(including the services of a bookkeeper) and where "administrative functions

of the two companies are highly integrated," alter ego status will not be

found where "the core functions of each business are operationally

distinct."[89] *Fourth*, questions remain as to the nature of the funds

contributed or loaned to the Entity Defendants by the Individual Defendants

and M&S IP.  Determining the nature of those funds in itself raises

significant questions.  For example, if the Individual Defendants loaned

money to the Entity Defendants, then the question arises as to whether

interest was charged on those loans.  The answer, in turn, speaks to whether

the loans were negotiated at arms-length, which is yet another *Passalacqua*

---

pursuing its separate corporate business rather than purely personal business of the shareholder, the corporate veil should not be pierced.").

[88]     Def. Counter. 56.1 ¶ 86.

[89]     *Armen Digital Graphics, Ltd. v. Amalgamated Lithographers of Am., Local One*, No. 96 Civ. 5844, 1997 WL 458738, at *8-9 (S.D.N.Y. Aug. 12, 1997).

factor and one that has not been addressed by the parties.[90]

In light of the evidence submitted by both parties on the issue of domination or control and the questions of fact that remain disputed, the Court cannot find that the balance of *Passalacqua* factors weighs in favor of either party, as a matter of law. Accordingly, each party's motion for summary judgment is denied on this prong alone.

## B.    Fraud or Wrong Causing Plaintiffs' Injuries

Even assuming, *arguendo,* that the Entity Defendants were dominated by the Individual Defendants, there is insufficient undisputed evidence in the record as to whether that domination was used to commit a fraud or wrong which caused plaintiffs injuries. As an initial matter, plaintiffs concede that they have not alleged fraud in their amended complaint.[91] Thus, in order to recover, plaintiffs must show that the Individual Defendants committed a "wrong" that resulted in their injury.

---

[90]    *See Passalacqua*, 933 F.2d at 140 (finding the failure to charge interest on funds advanced between the alleged alter egos and dominating entities to be relevant to the domination inquiry).

[91]    *See* Pl. Mem. at 18. The Court declines to address plaintiffs' fraudulent inducement claim pursuant to California Labor Code § 970, which, as plaintiffs concede, is made for the first time in their motion for summary judgment and is not supported by any facts.

27

Plaintiffs contend that, in July 2004, the Entity Defendants had sufficient assets to pay damages pursuant to the arbitration awards recently confirmed by the Supreme Court, New York County.  Plaintiffs allege that the Individual Defendants liquidated the Entity Defendants' assets in response to the court's confirmation of the awards and dissolved the entities "to protect those assets from attachment."[92]

As discussed above, asset-stripping by a dominating entity in order to render its alter ego judgment-proof constitutes a "fraud or wrong" sufficient to pierce the corporate veil.[93]  The parties agree that Ikahn had no revenue, income or profit in 1999 according to its tax return for that year.[94]  They also agree that Winter Films had no revenue, income or profit for the years 2000 through 2002, according to its tax returns.[95]  Moreover, they are in agreement that as of December 31, 2002, Winter Films had capital in the

---

[92]     Plaintiffs' Reply to Defendants' Opposition to Plaintiffs' Motion for Summary Judgment; or in the Alternative, Partial Summary Judgment at 9-10.

[93]     *See Carte Blanche*, 758 F. Supp. at 917.  ;

[94]     *See* Plaintiffs' Responses to Defendants' Rule 56.1 Statement and Plaintiffs' Genuine Issues of Material Fact ¶ 57.

[95]     *See id.* ¶ 59.

amount of $366,955.[96]  However, the record is devoid of evidence regarding

the Entity Defendants' financial state as of mid-year 2004, when the alleged

asset-stripping occurred.  In the absence of such crucial information, this

Court is unable to determine, as a matter of law, whether the Entity

Defendants possessed assets sufficient to satisfy plaintiffs' judgment, and

whether the Individual Defendants subsequently exercised their domination

to strip assets in order to render the entities judgment-proof.[97]  Although it

does seem suspicious that the Individual Defendants delayed in formally

dissolving the Entity Defendants until after judgment against them was

entered, such suspicion cannot support a finding as a matter of law.

---

[96]    *See* Def. Counter. 56.1 ¶ 64.

[97]    *See, e.g.*, *Network Enters.*, 2004 WL 1837349, at *6 ("Without a
sufficient record of undisputed facts that can support a determination that a
corporate veil should be pierced, granting of summary judgment is
inappropriate.").

## V.   CONCLUSION

For the reasons set forth above, both parties' motions for summary judgment are denied.  The Clerk of the Court is directed to close these motions [Docket Nos. 58, 59, 72 and 78].  A conference is scheduled for September 12, 2007 at 2:30 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            August 24, 2007

30

## - Appearances -

**For Plaintiffs:**

Richard Hamlish, Esq.
LAW OFFICES OF RICHARD HAMLISH
1860 Bridgegate Street
Westlake Village, California 91361
Telephone: (805) 497-6632

**For Defendants:**

Richard P. Romeo, Esq.
SALON MARROW DYCKMAN NEWMAN & BROUDY, LLP
292 Madison Avenue
New York, New York 10017
Telephone: (212) 661-7100